UNITED STATES DISTRICT COURT
Northern District of Georgia
Atlanta Division

| | |
|---|---|
| LIBERTY MUTUAL FIRE INSURANCE COMPANY<br><br>Plaintiff,<br><br>v.<br><br>Red Roof Inns, Inc., Red Roof Franchising, LLC, RRI West Management, LLC, RRI III, LLC, and FMW RRI NC, LLC,<br><br>Defendants,<br><br>and<br><br>Jane Doe #1, Jane Doe #2, Jane Doe #3, Jane Doe #4, W.K., E.H., M.M., R.P., M.B., D.P., A.F., C.A., R.K., K.P., T.H., H.B., and K.M.<br><br>Nominal Defendants. | Civil Action No.: 1:22-CV-04267-LMM |

**AMENDED COMPLAINT FOR DECLARATORY JUDGMENT**
**OF LIBERTY MUTUAL FIRE INSURANCE COMPANY**

I.     **INTRODUCTION**

1.      This is an action for declaratory relief and judgment pursuant to 28

U.S.C. §§ 2201 and 2202. Plaintiff Liberty Mutual Fire Insurance Company

("LMFIC") seeks a declaration of its rights and obligations as to Defendants Red Roof Inns, Inc. ("Red Roof Inns"), Red Roof Franchising, LLC ("Red Roof Franchising"), RRI West Management, LLC ("RRI West"), RRI III, LLC ("RRI III"), and FMW RRI NC, LLC ("FMW RRI NC") (collectively, the "Red Roof Entities") under certain policies of insurance issued by LMFIC to Red Roof Inns.

2.    The matters that give rise to LMFIC seeking such a declaration are seven underlying lawsuits (collectively, the "Underlying Lawsuits") filed against the Red Roof Entities by seventeen individuals (the "Underlying Plaintiffs") who allege they were trafficked for sex at hotels owned or operated by the Red Roof Entities in Atlanta and the surrounding area, including at: (1) 2200 Corporate Plaza, Smyrna, Georgia ("Red Roof Smyrna"); (2) 5171 Brook Hollow Parkway, Norcross, Georgia ("Red Roof Norcross"); (3) 1960 North Druid Hills Road NE, Atlanta, Georgia ("Red Roof Atlanta"); and (4) 4430 Frederick Drive SW, Atlanta Georgia ("Red Roof Frederick") (collectively, the "Underlying Hotels").

3.    In each of the Underlying Lawsuits, the Underlying Plaintiffs allege that the Red Roof Entities knowingly benefited from their participation in the trafficking of the Underlying Plaintiffs at one or more of the Underlying Hotels owned, operated, or managed by the Red Roof Entities. Furthermore, the Underlying Plaintiffs allege that Red Roof Inns and the other Red Roof Entities, which were

owned and controlled by Red Roof Inns, condoned, facilitated, and benefited from the trafficking that occurred at the Underlying Hotels.

4.     Among other relief and declarations, LMFIC seeks a declaration that it has no duty to defend or indemnify the Red Roof Entities against the Underlying Lawsuits because, among other reasons, the Underlying Plaintiffs' alleged injuries were not caused by an occurrence and were either expected or intended by the Red Roof Entities.

5.     Jane Doe #1, Jane Doe #2, Jane Doe #3, Jane Doe #4, W.K., E.H., M.M., R.P., M.B., D.P., A.F., C.A., R.K., K.P., T.H, H.B., and K.M., as the Underlying Plaintiffs, are nominal parties to this declaratory judgment action. The Underlying Plaintiffs have been named solely so that they will be bound by the judgment in this action. LMFIC does not seek relief from the Underlying Plaintiffs. In the event that the Underlying Plaintiffs stipulate and agree to be bound by the judgment entered in this case, LMFIC will voluntarily dismiss them from this action.

## II.   **PARTIES**

6.     LMFIC is a corporation organized under the laws of the State of Wisconsin with its principal place of business in Boston, Massachusetts.

7.     Upon information and belief, Red Roof Inns is a Delaware corporation with its principal place of business in Ohio. Upon information and belief, at all

relevant times, Red Roof Inns owned, operated, managed or were inextricably connected to the renting of rooms at the Underlying Hotels.

8.     Upon information and belief, Red Roof Franchising is a Delaware limited liability company with its principal place of business in Ohio. Upon information and belief, at all times relevant to this Complaint, Red Roof Inns owned more than 50% of Red Roof Franchising. Upon information and belief, at all relevant times, Red Roof Franchising owned, operated, managed or were inextricably connected to the renting of rooms at the Underlying Hotels.

9.     Upon information and belief, RRI West is a Delaware limited liability company with its principal place of business in Ohio. Upon information and belief, at all times relevant to this Complaint, Red Roof Inns owned more than 50% of RRI West. Upon information and belief, at all relevant times, RRI West owned, operated, managed or were inextricably connected to the renting of rooms at the Underlying Hotels.

10.     Upon information and belief, RRI III is a Delaware limited liability company with its principal place of business in Ohio. Upon information and belief, at all times relevant to this Complaint, Red Roof Inns owned more than 50% of RRI III. Upon information and belief, at all relevant times, RRI III owned, operated,

managed or were inextricably connected to the renting of rooms at the Underlying Hotels.

11.      Upon information and belief, FMW RRI NC is a Delaware limited liability company with its principal place of business in Ohio. Upon information and belief, at all times relevant to this Complaint, Red Roof Inns did not own more than 50% of FMW RRI NC. Upon information and belief, at all relevant times, FMW RRI NC owned, operated, managed or were inextricably connected to the renting of rooms at the Underlying Hotels.

12.      Upon information and belief, Jane Doe 1 is a citizen of the United States of America and a resident of the State of South Carolina, and may be served through her counsel, Patrick McDonough at Anderson, Tate & Carr, P.C.

13.      Upon information and belief, Jane Doe 2 is a citizen of the United States of America and a resident of the State of Georgia, and may be served through her counsel, Patrick McDonough at Anderson, Tate & Carr, P.C.

14.      Upon information and belief, Jane Doe 3 is a citizen of the United States of America and a resident of the State of Georgia, and may be served through her counsel, Patrick McDonough at Anderson, Tate & Carr, P.C.

15.     Upon information and belief, Jane Doe 4 is a citizen of the United States of America and a resident of the State of Tennessee, and may be served through her counsel, Patrick McDonough at Anderson, Tate & Carr, P.C.

16.     Upon information and belief, W.K. is a citizen of the United States of America and a resident of the State of Georgia, and may be served through her counsel, Patrick McDonough at Anderson, Tate & Carr, P.C.

17.     Upon information and belief, E.H. is a citizen of the United States of America and resident of the State of Georgia, and may be served through her counsel, Patrick McDonough at Anderson, Tate & Carr, P.C.

18.     Upon information and belief, M.M. is a citizen of the United States of America and a resident of the State of Georgia, and may be served through her counsel, Patrick McDonough at Anderson, Tate & Carr, P.C.

19.     Upon information and belief, R.P. is a citizen of the United States of America and a resident of the State of Georgia, and may be served through her counsel, Patrick McDonough at Anderson, Tate & Carr, P.C.

20.     Upon information and belief, M.B. is a citizen of the United States of America and a resident of the State of Florida, and may be served through her counsel, Patrick McDonough at Anderson, Tate & Carr, P.C.

21.     Upon information and belief, D.P. is a citizen of the United States of America and a resident of the State of Georgia, and may be served through her counsel, Patrick McDonough at Anderson, Tate & Carr, P.C.

22.     Upon information and belief, A.F. is a citizen of the United States of America and a resident of the State of Arizona, and may be served through her counsel, Patrick McDonough at Anderson, Tate & Carr, P.C.

23.     Upon information and belief, C.A. is a citizen of the United States of America and a resident of the State of Georgia, and may be served through her counsel, Patrick McDonough at Anderson, Tate & Carr, P.C.

24.     Upon information and belief, R.K. is a citizen of the United States of America and a resident of the State of Texas, and may be served through her counsel, Patrick McDonough at Anderson, Tate & Carr, P.C.

25.     Upon information and belief, K.P. is a citizen of the United States of America and a resident of the State of Nebraska, and may be served through her counsel, Patrick McDonough at Anderson, Tate & Carr, P.C.

26.     Upon information and belief, T.H. is a citizen of the United States of America and a resident of the State of Texas, and may be served through her counsel, Patrick McDonough at Anderson, Tate & Carr, P.C.

27.     Upon information and belief, H.B. is a citizen of the United States of America and a resident of the State of Georgia, and may be served through her counsel, Patrick McDonough at Anderson, Tate & Carr, P.C.

28.     Upon information and belief, K.M. is a citizen of the United States of America and a resident of the State of Georgia, and may be served through her counsel, Matthew B. Stoddard at The Stoddard Firm.

## III.   JURISDICTION AND VENUE

29.     This is a proceeding for declaratory relief pursuant to Title 28 of the United States Code, § 2201, *et seq,* to determine the scope of the respective rights, duties, and obligations, if any, of LMFIC under contracts of liability insurance with respect to Underlying Lawsuits for which the Red Roof Entities have sought coverage from LMFIC.

30.     Jurisdiction for this proceeding is proper in the federal court pursuant to 28 U.S.C. § 1332(a)(1) and (c)(1) because the parties are citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.

31.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this Complaint occurred in this district.

## IV.   FACTUAL BACKGROUND

### A.   The Underlying Lawsuits.

#### i.   *Jane Doe #1 v. Red Roof Inns, Inc., et al.*

32.    On August 26, 2019, Jane Doe #1, filed a lawsuit in the District Court for the Northern District of Georgia captioned *Jane Doe #1 v. Red Roof Inns, Inc., et al.*, Case No. 1:19-CV-3840 (the "Underlying Jane Doe #1 Lawsuit").

33.    In the Second Amended Complaint (the "Underlying Jane Doe #1 Lawsuit Complaint"), Jane Doe #1 alleges that "[f]rom 2011 through 2016, [she] was trafficked at hotels around Atlanta" and "[s]old for commercial sex out of Defendants' hotel rooms." Underlying Jane Doe #1 Lawsuit Complaint, ¶ 1 (attached as **Exhibit 1**).

34.    Jane Doe #1 alleges that Red Roof Inns, Red Roof Franchising, RRI West, and FMW RRI NC "owned, managed, supervised, operated, oversaw, [and] controlled the operation of, and were inextricably connected to the renting of rooms at" the Red Roof Smyrna. *Id.* ¶ 76. She further alleges that she was "trafficked" at the Red Roof Smyrna "[f]rom about 2011 to 2016." *Id.* ¶ 29.

35.    Jane Doe #1 alleges that "[Red Roof Smyrna] employees actively assisted [her] trafficker by calling their hotel room to warn them if law enforcement was on-site or enroute or if the volume of foot traffic to and from rooms was drawing

unwanted attention or guest complaints." *Id.* ¶ 31. According to Jane Doe #1, "[a]t a point in time, most of the [Red Roof Smyrna's] business came from traffickers renting hotel rooms," with "10–12 different traffickers staying at the [Red Roof Smyrna] at the same time ...." *Id.* ¶ 32. Jane Doe #1 further alleges that the "[Red Roof Smyrna] did not attempt to disguise the bustling sex trade taking place on its property." *Id.* ¶ 33.

36.     Jane Doe #1 alleges that "two websites were devoted to warning about the drug activity, prostitution, and sex trafficking at the [Red Roof Smyrna]." *Id.* ¶ 42. Jane Doe #1 also alleges that "[t]he highest level corporate employees at [Red Roof Inns] were directly informed of the conditions at the [Red Roof Smyrna]" and that "[i]n 2015, a hospitality industry executive and anti-trafficking advocate sent [certain] articles directly to [Red Roof Inns' president and CEO] [and] spoke with [him] on the phone and told him of the rampant and ongoing commercial sex trafficking occurring at the [Red Roof Smyrna]." *Id.* ¶¶ 48–49. She further alleges that Red Roof Inns' Vice President of Operations "regularly visited the [Red Roof Smyrna] to inspect the hotel and discuss the hotel's revenue and performance" and he "frequently stayed" at the hotel "several times each year" but "eventually refused to stay overnight at the [Red Roof Smyrna]" because of the trafficking activity. *Id.* ¶ 56.

37.     Jane Doe #1 alleges that Red Roof Inns, Red Roof Franchising, RRI West, and RRI III "owned, managed, supervised, operated, oversaw, [and] controlled the day-to-day operation of, and were inextricably connected to the renting of rooms at" the Red Roof Atlanta. *Id.* ¶ 120.

38.     Jane Doe #1 alleges that she was "trafficked" at the Red Roof Atlanta "[f]rom about 2011 to 2016." *Id.* ¶ 103. She further alleges, "an open and obvious commercial sex trade operated at the [Red Roof Atlanta]." *Id.* ¶ 108. Jane Doe #1 further alleges that "[e]mployees of the [Red Roof Atlanta] solicited [her] for sex," and "would call sex traffickers at the hotel to warn them when law enforcement was present at or coming to the hotel." *Id.* ¶¶ 109–10.

39.     In the Underlying Jane Doe #1 Lawsuit, Jane Doe #1 asserts causes of action against Red Roof Inns, Red Roof Franchising, RRI West, RRI III, and FMW RRI NC for: (i) violations of the Georgia Racketeer Influenced and Corrupt Organizations Act (O.C.G.A. § 16-14-4) ("Georgia RICO Statute"); (ii) violations of the Trafficking Victims Protection Reauthorization Act (18 U.S.C.A. § 1595(a)) (the "TVPRA"); and (iii) negligence.

ii.     ***Jane Doe #2 v. Red Roof Inns, Inc., et al.***

40.     On August 26, 2019, Jane Doe #2, filed a lawsuit in the District Court for the Northern District of Georgia captioned *Jane Doe #2 v. Red Roof Inns, Inc., et al.*, Case No. 1:19-CV-3841 (the "Underlying Jane Doe #2 Lawsuit").

41.     In the Second Amended Complaint (the "Underlying Jane Doe #2 Lawsuit Complaint"), Jane Doe #2 alleges that "[f]rom 2011 through 2016, [she] was trafficked at hotels around Atlanta" and "[s]old for commercial sex out of Defendants' hotel rooms." Underlying Jane Doe #2 Lawsuit Complaint, ¶ 1 (attached as **Exhibit 2**).

42.     Jane Doe #2 alleges that Red Roof Inns, Red Roof Franchising, RRI West, and FMW RRI NC "owned, managed, supervised, operated, oversaw, [and] controlled the operation of, and were inextricably connected to the renting of rooms at the" Red Roof Smyrna. *Id.* ¶ 77. She further alleges that she was "trafficked" at the Red Roof Smyrna "[f]rom about 2011 to 2014." *Id.* ¶ 29.

43.     Jane Doe #2 alleges that "[Red Roof Smyrna] employees actively assisted [her] trafficker by calling their hotel room to warn them if law enforcement was on-site or en route or if the volume of foot traffic to and from rooms was drawing unwanted attention or guest complaints." *Id.* ¶ 31. Jane Doe #2 further alleges that "at least one hotel employee solicited [her] for sex" and "[a]t a point in time, most of the [Red Roof Smyrna's] business came from traffickers renting hotel rooms"

with "10–12 different traffickers staying at the [Red Roof Smyrna] at the same time." *Id.* ¶¶ 32–33. Jane Doe #2 further alleges that the "[Red Roof Smyrna] did not attempt to disguise the bustling sex trade taking place on its property." *Id.* ¶ 34.

44.   Jane Doe #2 alleges that "two websites were devoted to warning about the drug activity, prostitution, and sex trafficking at the [Red Roof Smyrna]." *Id.* ¶ 43. Jane Doe #2 also alleges that "[t]he highest level corporate employees at [Red Roof Inns] were directly informed of the conditions at the [Red Roof Smyrna]" and that "[i]n 2015, a hospitality industry executive and anti-trafficking advocate sent [certain] articles directly to [Red Roof Inns' president and CEO] [and] spoke with [him] on the phone and told him of the rampant and ongoing commercial sex trafficking occurring at the [Red Roof Smyrna]." *Id.* ¶¶ 49–50. She further alleges that Red Roof Inns' Vice President of Operations "regularly visited the [Red Roof Smyrna] to inspect the hotel and discuss the hotel's revenue and performance" and he "frequently stayed" at the hotel "several times each year" but "eventually refused to stay overnight at the [Red Roof Smyrna]" because of the trafficking activity. *Id.* ¶ 57.

45.   Jane Doe #2 alleges that Red Roof Inns, Red Roof Franchising, RRI West, and RRI III "owned, managed, supervised, operated, oversaw, [and]

controlled the day-to-day operation of, and were inextricably connected to the renting of rooms at" the Red Roof Atlanta. *Id.* ¶ 118.

46.    Jane Doe #2 alleges that she was "trafficked" at the Red Roof Atlanta "[f]rom about 2011 to 2014." *Id.* ¶ 104. She further alleges "an open and obvious commercial sex trade operated at the [Red Roof Atlanta]." *Id.* ¶ 107. Jane Doe #2 further alleges that employees of the Red Roof Atlanta "would call sex traffickers at the hotel to warn them when law enforcement was present at or coming to the hotel." *Id.* ¶ 108.

47.    In the Underlying Jane Doe #2 Lawsuit, Jane Doe #2 asserts causes of action against Red Roof Inns, Red Roof Franchising, RRI West, RRI III, and FMW RRI NC for: (i) violations of the Georgia RICO Statute; (ii) violations of the TVPRA; and (iii) negligence.

### iii.    *Jane Doe #3 v. Red Roof Inns, Inc., et al.*

48.    On August 26, 2019, Jane Doe #3, filed a lawsuit in the District Court for the Northern District of Georgia captioned *Jane Doe #3 v. Red Roof Inns, Inc., et al.*, Case No. 1:19-CV-3843 (the "Underlying Jane Doe #3 Lawsuit").

49.    In the Second Amended Complaint (the "Underlying Jane Doe #3 Lawsuit Complaint"), Jane Doe #3 alleges that "[f]rom 2009 through 2012, [she] was trafficked at hotels around Atlanta" and "[s]old for commercial sex out of

Defendants' hotel rooms." Underlying Jane Doe #3 Lawsuit Complaint, ¶ 1 (attached as **Exhibit 3**).

50.    Jane Doe #3 alleges that Red Roof Inns, Red Roof Franchising, RRI West, and FMW RRI NC "owned, managed, supervised, operated, oversaw, [and] controlled the operation of, and were inextricably connected to the renting of rooms at," at the Red Roof Smyrna. *Id.* ¶ 76. She further alleges that she was "trafficked" at the Red Roof Smyrna "[f]rom about 2010 to 2012." *Id.* ¶ 33.

51.    Jane Doe #3 alleges that, "[a]t a point in time, most of the [Red Roof Smyrna's] business came from traffickers renting hotel rooms," with "10–12 different traffickers staying at the [Red Roof Smyrna] at the same time." *Id.* ¶ 35. Jane Doe #3 further alleges that the "[Red Roof Smyrna] did not attempt to disguise the bustling sex trade taking place on its property." *Id.* ¶ 36.

52.    Jane Doe #3 also alleges that "two websites were devoted to warning about the drug activity, prostitution, and sex trafficking at the [Red Roof Smyrna]." *Id.* ¶ 45. Jane Doe #3 also alleges that "[t]he highest level corporate employees at [Red Roof Inns] were directly informed of the conditions at the [Red Roof Smyrna]" and that "[i]n 2015, a hospitality industry executive and anti-trafficking advocate sent [certain] articles directly to [Red Roof Inns' president and CEO] [and] spoke with [him] on the phone and told him of the rampant and ongoing commercial sex

trafficking occurring at the [Red Roof Smyrna]." *Id.* ¶¶ 51–52. She further alleges that Red Roof Inns' Vice President of Operations "regularly visited the [Red Roof Smyrna] to inspect the hotel and discuss the hotel's revenue and performance" and he "frequently stayed" at the hotel "several times each year" but "eventually refused to stay overnight at the [Red Roof Smyrna]" because of the trafficking activities. *Id.* ¶ 59.

53.     Jane Doe #3 alleges that Red Roof Inns, Red Roof Franchising, RRI West, and RRI III "owned, managed, supervised, operated, oversaw, [and] controlled the day-to-day operation of, and were inextricably connected to renting of rooms at" the Red Roof Atlanta. *Id.* ¶ 111.

54.     Jane Doe #3 alleges that she was "trafficked" at the Red Roof Atlanta "[f]rom about 2010 to 2012." *Id*. ¶ 98. Jane Doe #3 further alleges that "an open and obvious sex trafficking was apparent to anyone who visited the [Red Roof Atlanta]." *Id.* ¶ 102. Jane Doe #3 further alleges that employees of the Red Roof Atlanta "would call sex traffickers at the hotel to warn them when law enforcement was present at or coming to the hotel." *Id.* ¶ 101.

55.     In the Underlying Jane Doe #3 Lawsuit, Jane Doe #3 asserts causes of action against Red Roof Inns, Red Roof Franchising, RRI West, RRI III, and FMW

RRI NC for: (i) violations of the Georgia RICO Statute; (ii) violations of the TVPRA; and (iii) negligence.

### iv.  Jane Doe #4 v. Red Roof Inns, Inc., et al.

56.     On August 26, 2019, Jane Doe #4, filed a lawsuit in the District Court for the Northern District of Georgia captioned *Jane Doe #4 v. Red Roof Inns, Inc., et al.*, Case No. 1:19-CV-3845 (the "Underlying Jane Doe #4 Lawsuit").

57.     In the Second Amended Complaint (the "Underlying Jane Doe #4 Lawsuit Complaint"), Jane Doe #4 alleges that "[f]rom 2010 through 2013, [she] was trafficked at hotels around Atlanta" and "[s]old for commercial sex out of Defendants' hotel rooms." Underlying Jane Doe #4 Lawsuit Complaint, ¶ 1 (attached as **Exhibit 4**).

58.     Jane Doe #4 alleges that Red Roof Inns, Red Roof Franchising, RRI West, and FMW RRI NC "owned, managed, supervised, operated, oversaw, [and] controlled the operation of, and were inextricably connected to renting of rooms at the" Red Roof Smyrna. *Id.* ¶ 74. She further alleges that she was "trafficked" at the Red Roof Smyrna "[f]rom about 2010 to 2012." *Id*. ¶ 27.

59.     Jane Doe #4 alleges that, "[a]t a point in time, most of the [Red Roof Smyrna's] business came from traffickers renting hotel rooms," with "10–12 different traffickers staying at the [Red Roof Smyrna] at the same time." *Id.* ¶ 30.

Jane Doe #4 further alleges that the "[Red Roof Smyrna] did not attempt to disguise the bustling sex trade taking place on its property." *Id.* ¶ 31.

60.     Jane Doe #4 alleges that "two websites were devoted to warning about the drug activity, prostitution, and sex trafficking at the [Red Roof Smyrna]." *Id.* ¶ 40.  Jane Doe #4 also alleges that "[t]he highest level corporate employees at [Red Roof Inns] were directly informed of the conditions at the [Red Roof Smyrna]" and that "[i]n 2015, a hospitality industry executive and anti-trafficking advocate sent [certain] articles directly to [Red Roof Inns' president and CEO] [and] spoke with [him] on the phone and told him of the rampant and ongoing commercial sex trafficking occurring at the [Red Roof Smyrna]." *Id.* ¶¶ 46–47. She further alleges that Red Roof Inns' Vice President of Operations "regularly visited the [Red Roof Smyrna] to inspect the hotel and discuss the hotel's revenue and performance" and he "frequently stayed" at the hotel "several times each year" but "eventually refused to stay overnight at the [Red Roof Smyrna]" because of the trafficking activities. *Id.* ¶ 54.

61.     In the Underlying Jane Doe #4 Lawsuit, Jane Doe #4 asserts causes of action against Red Roof Inns, Red Roof Franchising, RRI West, and FMW RRI NC for: (i) violations of the Georgia RICO Statute; (ii) violations of the TVPRA; and (iii) negligence.

<em><strong>v.       W.K., et. al. v. Red Roof Inns, Inc., et al.</strong></em>

62.    On December 29, 2020, certain individuals filed a lawsuit in the District Court for the Northern District of Georgia captioned *W.K., et al. v. Red Roof Inns, Inc., et al.*, Case No. 1:20-CV-5263 (the "Underlying W.K. Lawsuit").

63.    In the Second Amended Complaint (the "Underlying W.K. Lawsuit Complaint"), plaintiffs W.K., E.H., M.M., R.P., M.B., D.P., A.F., C.A., R.K., K.P., and T.H. (collectively, the "Underlying W.K. Plaintiffs") assert claims against the Red Roof Entities which arise from their allegations that the entities "are trafficking victims who were sold for sex" at the Red Roof Smyrna and the Red Roof Atlanta. Underlying W.K. Lawsuit Complaint, ¶ 4 (attached as **Exhibit 5**).

64.    W.K., E.H., M.M., R.P., M.B., D.P., and A.F. allege that, at various times between 2010 and 2018, they were trafficked at the Red Roof Smyrna. *Id.* ¶¶ 11–19.

65.    W.K., R.P., C.A., R.K., K.P., and T.H. allege that, at various times between 2009 and 2017, they were trafficked at the Red Roof Atlanta. *Id.* ¶¶ 11, 13, 20–22.

66.    The Underlying W.K. Plaintiffs allege that Red Roof Smyrna and Red Roof Atlanta "have been known centers of commercial sex" that "[e]mployees at all levels, from hotel cleaning staff to the CEO of Red Roof Inns knew of the rampant

sex trafficking and prostitution at these two hotels" and that the defendants "knowingly permitted the [Red Roof Smyrna] and [Red Roof Atlanta] to be used for prostitution in violation of Georgia law." *Id.* ¶¶ 1–2, 6.

67.     The Underlying W.K. Plaintiffs allege that Red Roof Inns "exercised control over the day-to-day operations" of the Red Roof Smyrna and Red Roof Atlanta. *Id.* ¶ 35.

68.     With respect to the Red Roof Smyrna, the Underlying W.K. Plaintiffs allege as follows:

    i.    W.K. alleges that, "[f]rom approximately 2013 through 2014, when she was 16 years old, [she] was sold for sex numerous times from hotel rooms at the [Red Roof Smyrna]." *Id.* ¶ 149. She further alleges that "[m]ultiple [Red Roof Smyrna] employees knew [her] trafficker and bought drugs from him and other traffickers at the hotel" and that one employee "stood and watched while [her] trafficker choked her in an exterior breezeway of the hotel [and] the employee looked directly at [her] and then walked away without doing anything to stop the assault, assist [her], or call for help." *Id.* ¶¶ 153–54.

    ii.   E.H. alleges that, "[f]rom approximately 2014 through 2018, [she] was trafficked dozens of times each year from hotel rooms at the [Red Roof

Smyrna]" and that she "was forced to have sex with 10–15 men each day." *Id.* ¶¶ 158, 162. She further alleges that "[m]ultiple [Red Roof Smyrna] employees knew [her] trafficker, knew she was being trafficked, and actively assisted her traffickers by functioning as lookouts" and that "[m]ultiple security guards at the hotel repeatedly paid [her] trafficker for sex with [her] . . . while they were on duty at the [Red Roof Smyrna]." *Id.* ¶¶ 166, 170.

iii. M.M. alleges that, "[f]rom approximately 2010 through 2017, [she] was trafficked from hotel rooms at the [Red Roof Smyrna]" and that she "was forced to have sex with up to 8 men per day." *Id.* ¶¶ 171, 173. She also alleges that "[m]ultiple [Red Roof Smyrna] hotel employees knew [her] traffickers and actively assisted them by functioning as lookouts" and that "her traffickers would hang out in the front office with [Red Roof Smyrna] hotel employees." *Id.* ¶¶ 174–75.

iv. R.P. alleges that, "[f]rom about 2012 through 2016, [she] was trafficked numerous times from hotel rooms at the [Red Roof Smyrna]" and that she "was forced to have sex with more than 10 men per day." *Id.* ¶¶ 180, 182.

v.  M.B. alleges that, "[i]n 2015 and 2016, [she] was trafficked from hotel rooms at the [Red Roof Smyrna]" and that she "was forced to have sex with [a]n average of 10 men per day." *Id.* ¶¶ 183, 185.

vi.  D.P. alleges that, "[o]n multiple occasions in 2017, [she] was trafficked from hotel rooms at the [Red Roof Smyrna]" and that she "was forced to have sex with as many as 10 men per day." *Id.* ¶¶ 187, 189. She further alleges that "[m]ultiple [Red Roof Smyrna] hotel employees knew [her] trafficker and were aware that he was trafficking [her] for sex at the hotel" and that a "[i]nstead of calling the police, the hotel security guard told the trafficker to be more discrete so that the 'real cops' would not come to the hotel." *Id.* ¶¶ 190–91.

vii.  A.F. alleges that, "[i]n 2010 and 2011, [she] was trafficked from hotel rooms at the [Red Roof Smyrna]" and that she "was forced to have sex with up to 5 men per day." *Id.* ¶¶ 193, 195.

69.  The Underlying W.K. Plaintiffs allege that, "[a]t any given time, a [] hotel employee estimated that  there were 10 to 12 different traffickers operating at the [Red Roof Smyrna], many of whom controlled more than one victim at a time and some of whom controlled 4 to 5 victims at a time." *Id.* ¶ 96.

70.     The Underlying W.K. Plaintiffs allege that "it was common for there to be more than 100 buyers of commercial sex at the [Red Roof Smyrna] during any given day"; that "commercial sex was so prevalent that it was recognized and accepted as part of their regular operations, and they created a [no refund after 15 minutes] policy to address it"; and that "from roughly 2010 through at least 2016, a significant portion of the location's business—at times a majority—came from renting hotel rooms to sex traffickers and prostitutes." *Id.* ¶¶ 95, 100, 105.

71.     The Underlying W.K. Plaintiffs allege that "[s]ometime in 2011–2012, Cobb County police notified the then-general manager of the [Red Roof Smyrna] that sex traffickers had paid a former general manager and a hotel employee to act as lookouts" and that "[d]espite this notice, the employee continued working at the hotel for six more months." *Id.* ¶ 41.

72.     The Underlying W.K. Plaintiffs allege that "employees continued to act as lookouts for traffickers, alerting them to the presence of law enforcement, through at least 2018," and that "[i]n addition to the knowledge of the hotel employees, corporate employees of [Red Roof Inns] also had direct knowledge of trafficking and prostitution at the [Red Roof Smyrna]", including Red Roof Inns' Vice President of Operations, who "regularly visited the [Red Roof Smyrna] to inspect the hotel" and who "had the opportunity to personally and directly observe the conditions,

including the rampant sex trafficking and prostitution at the [Red Roof Smyrna] and who "eventually refused to stay overnight at the [Red Roof Smyrna]". *Id.* ¶¶ 43–47. The Underlying W.K. Plaintiffs further allege that, "[i]n 2015, a hospitality industry executive and anti-trafficking advocate sent several online articles detailing sex trafficking at the [Red Roof Smyrna] . . . directly to" Red Roof Inns' then-President and CEO, and that in subsequent calls and emails to the CEO, the advocate identified a specific "sex trafficker who was operating at the [Red Roof Smyrna]" *Id.* ¶¶ 50–52.

73.    With respect to the Red Roof Atlanta, the Underlying W.K. Plaintiffs allege as follows:

i.    W.K. alleges that, "[i]n 2014, when she was 16 years old, [she] was trafficked out of hotel rooms at the [Red Roof Atlanta]" and that she was trafficked alongside other girls that were 13 or 14 years old. *Id.* ¶¶ 271–72.

ii.    R.P. alleges that, "[f]rom approximately 2012 through 2017, [she] was trafficked numerous times from hotel rooms at the [Red Roof Atlanta]" and that she "was forced to have sex with as many as 10 men per day and, for at least one of her traffickers, had to meet a quota of $900 per day." *Id.* ¶¶ 273, 276.

iii.    C.A. alleges that, "[f]rom 2009–2014, [she] was trafficked by two different traffickers on dozens of occasions out of hotel rooms at the [Red Roof Atlanta]" and that she was "forced to have sex with as many as 12 men per day." *Id.* ¶¶ 278, 280. She further alleges that "[o]ne of [her] traffickers was friendly with the employees at the [Red Roof Atlanta]" and "[h]otel employees would frequently purchase drugs from sex traffickers in the hotel parking lot." *Id.* ¶ 284.

iv.    R.K. alleges that she was trafficked from 2009-2013 at the Red Roof Atlanta. *Id.* ¶ 286. She further alleges that she "was forced to have sex with approximately 10 men per day" and "[o]ne of her traffickers required a daily quota of at least $1,000 while at the [Red Roof Atlanta]." *Id.* ¶ 287. She also alleges that her trafficker was friendly with hotel employees, who would purchase drugs from him in the hotel parking lot. *Id.* ¶ 291.

v.    K.P. alleges that from 2011-2014 she was trafficked at the Red Roof Atlanta and "that there were between two and ten traffickers at the [Red Roof Atlanta], each with their own victims, at any given time." *Id.* ¶¶ 293–94.

vi.   T.H. alleges that "she was trafficked for commercial sex at the [Red Roof Atlanta]" from "2009 through 2011." *Id.* ¶¶ 587, 589.

74.   The Underlying W.K. Plaintiffs allege that, from at least 2009 through December 2012, "several [Red Roof Inns] corporate employees worked at both [Red Roof Smyrna] and [Red Roof Atlanta]" and that "[t]he conditions at the [Red Roof Smyrna] location should have put the [Red Roof Atlanta] Defendants – who themselves knew or should have known the signs of sex trafficking – on notice of the possibility of trafficking occurring at other, nearby locations, like the [Red Roof Atlanta]". *Id.* ¶¶ 197–98, 200.

75.   The Underlying W.K. Plaintiffs allege "[t]rafficking at the [Red Roof Atlanta] was also open and obvious." *Id.* ¶ 201. The Underlying W.K. Plaintiffs also allege that employees at the Red Roof Atlanta "solicited sex trafficking victims for sex at the hotel"; "would act as lookouts and call sex traffickers at the hotel to warn them when law enforcement was present at or on the way to the hotel"; and "would also monitor the amount of buyer traffic to rooms and warned traffickers to slow or stop that traffic if it had been too heavy" and "also cautioned traffickers if other guests complained." *Id.* ¶¶ 207–09.

76.   The Underlying W.K. Plaintiffs allege that the managers and owners of the Red Roof Atlanta had notice of trafficking occurring at the hotel from public

statements made about trafficking in the Atlanta area, from online reviews of the Red Roof Atlanta, and from the number and nature of police visits to the property. *See id.* ¶¶ 212–60.

77.     In the Underlying W.K. Lawsuit, the Underlying W.K. Plaintiffs assert the following causes of action against Red Roof Inns, Red Roof Franchising, RRI West, RRI III, and FMW RRI NC: (i) negligence; (ii) violation of the TVPRA; and (iii) violation of the Georgia RICO Statute.

### vi.     *H.B. v. Red Roof Inns, Inc., et al.*

78.     On March 24, 2022, H.B. filed a lawsuit in the District Court for the Northern District of Georgia captioned *H.B. v. Red Roof Inns, Inc., et al.*, Case No. 1:22-CV-01181 (the "Underlying H.B. Lawsuit").

79.     In the Complaint (the "Underlying H.B. Lawsuit Complaint"), H.B., asserts claims against Red Roof Inns and FMW RRI I which arise from her allegation that she was sold for sex at the Red Roof Norcross in January 2012. Underlying H.B. Lawsuit Complaint, ¶¶ 1, 17 (attached as **Exhibit 6**).

80.     H.B. alleges that Red Roof Inns and FMW RRI I, LLC ("FMW RRI I") "jointly owned, managed, supervised, operated, oversaw, controlled the operation of, and/or were inextricably connected to the renting of rooms at the [Red Roof Norcross]." *Id.* ¶ 8.

81.     H.B. alleges that "when [she] was trafficked at the [Red Roof Norcross], she witnessed other sex traffickers operating openly and brazenly at the hotel" and "witnessed as many as 10 other women and children being sold for sex at the [Red Roof Norcross]." *Id.* ¶¶ 20–21.

82.     H.B. alleges that Red Roof Inns and FMW RRI I "participated in a venture by associating with [her] traffickers, facilitating [her] minor sex trafficking, and providing to [her] traffickers the necessary venue and market for [her] sex trafficking" and that "[i]n the course of this venture, numerous buyers paid to have sex with [her], a 16-year-old child, at the [Red Roof Norcross]." *Id.* ¶ 56.

83.     H.B. alleges that Red Roof Inns and FMW RRI I "knew or should have known the venture violated the TVPRA because [Red Roof Inns and FMW RRI I], their agents and representatives, had the opportunity to observe [her], a minor, at the hotel, with and without her traffickers, the signs of minor sex trafficking exhibited by [her], her traffickers, and the rooms in which she was trafficked, and the frequent traffic of adult male buyers to [her] rooms." *Id.* ¶ 58. Specifically, these alleged "signs of a sex trafficking victim" include: (i) her "age and inappropriate appearance, fatigue, sleep deprivation, injuries, [] failure to make eye contact with others, no control of or possession of money, loitering, soliciting male patrons, and monitoring and control of H.B. by her traffickers"; (ii) "an extraordinary number of

used condoms" and "multiple cell phones" in her room; and (iii) frequent requests for "an excessive number of towels from housekeeping." *Id*. ¶¶ 23–24.

84.     H.B. alleges that Red Roof Inns and FMW RRI I "knowingly benefitted from [her] sex trafficking by receiving a percentage of the revenue generated by the operation of the [Red Roof Norcross], including a percentage of the revenue generated for the rate charged on the rooms in which [she] was trafficked." *Id*. ¶ 55.

85.     H.B. alleges that Red Roof Norcross employees "called sex traffickers, including [her] traffickers, to warn them when law enforcement was present at or coming to the hotel or warning them to slow down or stop buyer traffic to a particular room in order to assist the traffickers in evading detection from other guests and the police." *Id*. ¶ 34.

86.     H.B. alleges that "[w]hen security guards reported the obvious prostitution and drug activity to [Red Roof Norcross] employees, the security guards were told by the [Red Roof Norcross] employees to not do anything about it." *Id*. ¶ 35.

87.     H.B. alleges that, "[p]rior to her trafficking at the [Red Roof Norcross], [hotel] employees informed Jay Moyer, Director of Operations for [Red Roof Inns], and Vince Vittatoe, Director of Safety and Security for [Red Roof Inns], about the crime and prostitution that was constant at the [Red Roof Norcross]." *Id*. ¶ 40.

88.     H.B. alleges that she was "rescued from the [Red Roof Norcross]" in January 2012 as a result of a sting operation by the Gwinnett County Police Department, and that during this sting "[Red Roof Norcross] employees called [her] sex traffickers to alert them to the police presence at the [Red Roof Norcross] but were too late in relaying their message." *Id.* ¶ 25.

89.     In the Underlying H.B. Lawsuit Complaint, H.B. asserts the following causes of action against Red Roof Inns and FMW RRI I: (i) violation of the TVPRA; and (ii) violations of the Georgia RICO Statute.

### vii.     *K.M. v. CPA Hotels of Atlanta, LLC et al.*

90.     On January 13, 2023, K.M. filed a lawsuit in the District Court for the Northern District of Georgia captioned *K.M. v. CPA Hotels of Atlanta, LLC et al.*, Case No. 1:23-CV-00190 (the "Underlying K.M. Lawsuit").

91.     In the Complaint (the "Underlying K.M. Lawsuit Complaint"), K.M., asserts claims against Red Roof Inns which arise from her allegation that she was "trafficked for sex" at the Red Roof Frederick "[f]rom approximately June of 2015 until approximately December of 2015," and that during this time, Red Roof Inns "jointly operated and managed" the Red Roof Frederick.  Underlying K.M. Lawsuit Complaint, ¶¶ 2−3 (attached as **Exhibit 7**).

92.     K.M. alleges that she "was required to have sex with men in exchange for money," which would be used to "pay rent so that [she] could again be forced [to] have sex with men at the [Red Roof Frederick]." *Id.* ¶ 25. K.M. alleges that her "trafficking . . . took place throughout the hotel, including in the rooms, in the parking lot, and in other common areas of the hotel." *Id.* ¶ 34.

93.     K.M. alleges that her trafficker "threatened" her with "violence" if she "did not continue to perform sex work at the [Red Roof Frederick]," and that her trafficker "frequently beat [her] at the [Red Roof Frederick,] including in the rooms and in the parking lot." *Id.* ¶¶ 26−27. K.M. further alleges that "[o]n multiple occasions, [Red Roof Inns'] employees – including the [] manager − observed K.M. getting hit, kicked, and beat in the front lobby of the [Red Roof Frederick]." *Id.* ¶ 31.

94.     K.M. further alleges that "for a large portion of the trafficking, [she] was pregnant" and was told by her trafficker "that he would take her young child away if she did not continue to have sex with men for money." *Id.* ¶¶ 28, 30.

95.     In the Underlying K.M. Lawsuit, K.M. asserts one cause of action against Red Roof Inns for violations of the TVPRA.

B.      **The LMFIC Policies.**

96.      Plaintiff LMFIC issued the following commercial insurance policies to

Red Roof Inns:

- TB2-641-437760-071, with a policy period of July 1, 2011 to July 1, 2012 (the "2011 Policy");

- TB2-641-437760-072, with a policy period of July 1, 2012 to July 1, 2013 (the "2012 Policy");

- TB2-641-437760-073, with a policy period of July 1, 2013 to July 1, 2014 (the "2013 Policy");

- TB2-641-437760-074, with a policy period of July 1, 2014 to July 1, 2015 (the "2014 Policy");

- TB2-641-437760-075, with a policy period of July 1, 2015 to July 1, 2016 (the "2015 Policy");

- TB2-641-437760-076, with a policy period of July 1, 2016 to July 1, 2017 (the "2016 Policy");

- TB2-641-437760-077, with a policy period of July 1, 2017 to July 1, 2018 (the "2017 Policy"); and

- TB2-641-437760-078, with a policy period of July 1, 2018 to July 1, 2019 (the "2018 Policy")

(collectively the "LMFIC Policies"). Selected pages of the LMFIC Policies are

attached hereto as **Exhibit 8, LMFIC-RRI 01−LMFIC-RRI 96**.

97.      The LMFIC Policies contain two liability coverage parts: (i) Coverage

A, Bodily Injury and Property Damage Liability; and (ii) Coverage B, Personal and

Advertising Injury Liability.  In addition, by endorsement, the 2017 Policy and the

2018 Policy contain a third liability coverage part, which provides Hospitality Services Errors and Omissions Liability Coverage.

98.   The LMFIC Policies have an Each Occurrence Limit in the amount of $1 million, a Personal and Advertising Injury Limit in the amount of $1 million, and a General Aggregate Limit in the amount of $2 million. *Id.* at LMFIC-RRI 01; LMFIC-RRI 11; LMFIC-RRI 21; LMFIC-RRI 32; LMFIC-RRI 43; LMFIC-RRI 54; LMFIC-RRI 65; LMFIC-RRI 81.

99.   The LMFIC Policies also have a per location Designated General Aggregate Limit in the amount of $2 million, with a $10 million Total Aggregate Limit for all Projects and Locations for the 2011-2016 Policies and a $20 million Total Aggregate Limit for all Projects and Locations for the 2017 Policy and 2018 Policy. *Id.* at LMFIC-RRI 09-10; LMFIC-RRI 19-20; LMFIC-RRI 30-31; LMFIC-RRI 41-42; LMFIC-RRI 52-53; LMFIC-RRI 63-64; LMFIC-RRI 74-75; LMFIC-RRI 90-91.

100.   With respect to the Hospitality Services Errors and Omissions Liability Coverage, the 2017 Policy and the 2018 Policy have a Per Wrongful Act Limit in the amount of $1 million, an Aggregate Limit in the amount of $1 million, and a Deductible Amount of $10,000. *Id.* at LMFIC-RRI 76-80; LMFIC-RRI 92-96.

### i. *Coverage A: Bodily Injury and Property Damage Liability.*

101.   The Insuring Agreement for Coverage A of the LMFIC Policies provides, in part, as follows:

SECTION I – COVERAGES

**COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1. Insuring Agreement**

    a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. . . .

    b. This insurance applies to "bodily injury" or "property damage" only if:

        (1) The "bodily injury" or "property damage" is caused by an "occurrence" . . .

        (2) The "bodily injury" or "property damage" occurs during the policy period.

*Id.* at LMFIC-RRI 02; LMFIC-RRI 12; LMFIC-RRI 22; LMFIC-RRI 33; LMFIC-RRI 44; LMFIC-RRI 55; LMFIC-RRI 66; LMFIC-RRI 82.

102.   The LMFIC Policies, other than the 2011 Policy, define the term "bodily injury" to mean:

a. Bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time; and

b. Mental anguish, shock or humiliation arising out of injury as defined in Paragraph a. above. Mental anguish means any type of mental or emotional illness or distress.

*Id*. at LMFIC-RRI 16; LMFIC-RRI 29; LMFIC-RRI 40; LMFIC-RRI 51; LMFIC-RRI 62; LMFIC-RRI 73; LMFIC-RRI 89.

103.   The 2011 Policy defines the term "bodily injury" to mean:

"Bodily injury" means":

1. bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time; and

2. mental anguish, shock or humiliation arising out of injury as defined in paragraph 1.

*Id*. at LMFIC-RRI 08.

104.   The LMFIC Policies define the term "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id*. at LMFIC-RRI 07; LMFIC-RRI 18; LMFIC-RRI 28; LMFIC-RRI 39; LMFIC-RRI 50; LMFIC-RRI 61; LMFIC-RRI 72; LMFIC-RRI 88.

105.   Coverage A of the LMFIC Policies contains an Expected or Intended Injury Exclusion, which bars coverage for:

> "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" or "property damage" resulting from the use of reasonable force to protect persons or property.

*Id*. at LMFIC-RRI 05; LMFIC-RRI 15; LMFIC-RRI 25; LMFIC-RRI 36; LMFIC-RRI 47; LMFIC-RRI 58; LMFIC-RRI 69; LMFIC-RRI 85.

### *ii.   Coverage B: Personal and Advertising Injury Liability.*

106.   The Insuring Agreement for Coverage B of the LMFIC Policies provides, in part, as follows:

**COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. . . .

b. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed . . . during the policy period.

*Id*. at LMFIC-RRI 03; LMFIC-RRI 13; LMFIC-RRI 23; LMFIC-RRI 34; LMFIC-RRI 45; LMFIC-RRI 56; LMFIC-RRI 67; LMFIC-RRI 83.

107.    The LMFIC Policies define the term "personal and advertising injury" to mean injury, including consequential "bodily injury," arising out of one or more of the following offenses:

     a.  False arrest, detention or imprisonment;

     b.  Malicious prosecution;

     c.  The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

     d.  Oral or written "publication" directly to the public at large or material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

     e.  (1) Oral or written "publication" directly to the public at large of material that violates a person's right of privacy;

        (2) Oral or written "publication" of material that violates a person's right of privacy by misappropriation of that person's name or likeness;

     f.  The use of another's advertising idea in your "advertisement"; or

     g.  Infringing upon another's copyright, trade dress or slogan in your "advertisement."

*Id*. at LMFIC-RRI 04; LMFIC-RRI 14; LMFIC-RRI 24; LMFIC-RRI 35; LMFIC-RRI 46; LMFIC-RRI 57; LMFIC-RRI 68; LMFIC-RRI 84.

108.    Coverage B of the LMFIC Policies contains a Knowing Violation of Rights of Another Exclusion, which bars coverage for:

> "Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury."

*Id*. at LMFIC-RRI 03; LMFIC-RRI 13; LMFIC-RRI 23; LMFIC-RRI 34; LMFIC-RRI 45; LMFIC-RRI 56; LMFIC-RRI 67; LMFIC-RRI 83.

109.    Coverage B of the LMFIC Policies contains a Criminal Acts Exclusion, which bars coverage for:

> "Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

*Id*. at LMFIC-RRI 03; LMFIC-RRI 13; LMFIC-RRI 23; LMFIC-RRI 34; LMFIC-RRI 45; LMFIC-RRI 56; LMFIC-RRI 67; LMFIC-RRI 83.

### iii.    *Errors and Omissions Endorsement.*

110.    The Insuring Agreement for the Hospitality Services Errors and Omissions Liability endorsement ("Errors and Omissions Endorsement") contained in the 2017 Policy and 2018 Policy, states, in relevant part:

**1. Insuring Agreement**

> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "claims" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "claims" to which this insurance does not apply. We may, at our discretion, investigate any "wrongful act" or "claim" and settle any "claim" or "suit" that may result. But:

(1)  The amount we will pay for damages is limited as described in Paragraph D – Limits Of Insurance of the Hospitality Services Errors and Omissions Liability Coverage endorsement; and

(2)  Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

b.  This insurance applies only to "claims" caused by "wrongful act" committed by you in the course of providing "hospitality services", and only if the "wrongful act" is first committed during the policy period.

*Id*. at LMFIC-RRI 76; LMFIC-RRI 92.

111.  The Errors and Omissions Endorsement defines the term "wrongful act" to mean "a negligent act, error or omission." *Id*. at LMFIC-RRI 80; LMFIC-RRI 96.

112.  The Errors and Omissions Endorsement defines the term "claim" to mean "a written demand for monetary relief," and further states, "[a]ll 'claims' arising out of the same, related, or continuing 'wrongful acts' shall be deemed to be one 'claim.'" *Id*. at LMFIC-RRI 79; LMFIC-RRI 95.

113.  The Errors and Omissions Endorsement contains a Criminal Acts/Expected or Intended Exclusion, which bars coverage for "claims":

Based upon, arising from, or in any way involving any dishonest, fraudulent, criminal, malicious, intentional or willful act or omission by any insured or any loss expected or intended by any insured.

*Id*. at LMFIC-RRI 76; LMFIC-RRI 92.

114.    The Errors and Omissions Endorsement contains a Bodily Injury/Emotional Distress Exclusion, which bars coverage for "claims":

e.    Bodily Injury/Emotional Distress

Arising out of any physical injury, sickness, disease or death of any person, including emotional distress or mental anguish whether or not accompanied by physical injury, sickness or disease.

*Id*. at LMFIC-RRI 77; LMFIC-RRI 93.

115.    The Errors and Omissions Endorsement contains a Personal and Advertising Injury Exclusion, which bars coverage for "claims" arising out of "personal and advertising injury." *Id*. at LMFIC-RRI 78; LMFIC-RRI 94.

*iv.    Non-Cumulation of Liability Endorsement.*

116.    The LMFIC Policies contain a Non-Cumulation of Liability Endorsement, which states as follows:

**NON-CUMULATION OF LIABILITY
(SAME OCCURRENCE)**

1.    The following is added to paragraph 4. of the Limits of Insurance Section:

If one "occurrence" causes "personal and advertising injury" to which this policy applies and to which one or more prior and/or

future liability policy(ies) issued to you by us also applies, then this policy's Personal and Advertising Injury Limit will be reduced by the amount of each payment made by us under the other policy(ies) because of such "occurrence."

2. The following is added to paragraph 5. of the Limits of Insurance Section:

If one "occurrence" causes "bodily injury" and/or "property damage" during the policy period and during the policy period of one or more prior and/or future liability policy(ies) issued to you by us, then this policy's Each Occurrence Limit will be reduced by the amount of each payment made by us under the other policy(ies) because of such "occurrence."

3. The final paragraph of the Limits of Insurance Section is replaced with the following:

The aggregate Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the aggregated Limits of Insurance. However, the Each Occurrence Limit is the most we will pay for damages and Medical Expenses because of all "bodily injury" and "property damage" arising out of any one "occurrence" and the Personal and Advertising Injury Limit is the most we will pay for damage because of all "personal and advertising injury" arising out of any one "occurrence," regardless of the length of the policy period.

*Id*. at LMFIC-RRI 06; LMFIC-RRI 17; LMFIC-RRI 26; LMFIC-RRI 37; LMFIC-RRI 48; LMFIC-RRI 59; LMFIC-RRI 70; LMFIC-RRI 86.

**C.**     **LMFIC's Reservation of Rights Under the LMFIC Policies**.

117.     On February 20, 2020, LMFIC agreed, subject to a reservation of rights, to provide Red Roof Inns, Red Roof Franchising, RRI West, and FMW RRI NC with a defense against the Underlying Jane Doe #1 Lawsuit.

118.     On February 20, 2020, LMFIC agreed, subject to a reservation of rights, to provide Red Roof Inns, Red Roof Franchising, RRI West, and FMW RRI NC with a defense against the Underlying Jane Doe #2 Lawsuit.

119.     On February 20, 2020, LMFIC agreed, subject to a reservation of rights, to provide Red Roof Inns, Red Roof Franchising, RRI West, and FMW RRI NC with a defense against the Underlying Jane Doe #3 Lawsuit.

120.     On February 20, 2020, LMFIC agreed, subject to a reservation of rights, to provide Red Roof Inns, Red Roof Franchising, RRI West, and FMW RRI NC with a defense against the Underlying Jane Doe #4 Lawsuit.

121.     On March 4, 2021, LMFIC agreed, subject to a reservation of rights, to provide Red Roof Inns, Red Roof Franchising, RRI West, RRI III, and FMW RRI NC with a defense against the Underlying W.K. Lawsuit. With respect to FMW RRI NC, LMFIC agreed, subject to a reservation of rights, to provide a defense against the Underlying W.K. Lawsuit under the 2018 Policy only.

122.    On June 6, 2022, LMFIC agreed, subject to a reservation of rights to provide Red Roof Inns with a defense against the Underlying H.B. Lawsuit.

123.    On January 25, 2023, LMFIC agreed, subject to a reservation of rights to provide Red Roof Inns with a defense against the Underlying K.M. Lawsuit.

## COUNT I
## Declaratory Relief – Underlying Jane Doe #1 Lawsuit

124.    LMFIC re-alleges and incorporates by reference Paragraphs 1 to 123 as though fully set forth herein.

125.    The 2011 Policy, 2012 Policy, 2013 Policy, 2014 Policy, 2015 Policy, and the 2016 Policy (the "2011-2016 Policies") do not afford coverage under Coverage A for the Underlying Jane Doe #1 Lawsuit to the extent Jane Doe #1's alleged "bodily injury" did not occur during the 2011-2016 Policies' policy periods.

126.    There is no duty to defend the Red Roof Entities under the 2011-2016 Policies against the Underlying Jane Doe #1 Lawsuit Complaint because Jane Doe #1 does not allege "bodily injury" caused by an "occurrence".

127.    There is no coverage under Coverage A for the Underlying Jane Doe #1 Lawsuit under the 2011-2016 Policies because Jane Doe #1's alleged "bodily injury" was not caused by an "occurrence".

128.    The Expected and Intended Injury Exclusion bars coverage for Jane Doe #1's alleged "bodily injury" under Coverage A of the 2011-2016 Policies.

129.    In the Underlying Jane Doe #1 Lawsuit Complaint, Jane Doe #1 does not allege an offense resulting in a "personal and advertising injury" under Coverage B of the 2011-2016 Policies.

130.    In the Underlying Jane Doe #1 Lawsuit Complaint, Jane Doe #1 does not allege "personal and advertising injury" arising out of the business of Red Roof Inns, Red Roof Franchising, RRI West, RRI III, or FMW RRI NC under Coverage B of the 2011-2016 Policies.

131.    To the extent Jane Doe #1 alleges "personal and advertising injury" in the Underlying Jane Doe #1 Lawsuit Complaint, the Knowing Violation of Rights of Another Exclusion in the 2011-2016 Policies bars coverage for Jane Doe #1's alleged "personal and advertising injury" under Coverage B of the 2011-2016 Policies.

132.    To the extent Jane Doe #1 alleges "personal and advertising injury" in the Underlying Jane Doe #1 Lawsuit Complaint, the Criminal Acts Exclusion in the 2011-2016 Policies bars coverage for Jane Doe #1's alleged "personal and advertising injury" under Coverage B of the 2011-2016 Policies.

133.    The LMFIC Policies do not afford coverage to Red Roof Inns, Red Roof Franchising, RRI West, RRI III, or FMW RRI NC for the Underlying Jane Doe #1 Lawsuit.

134.     Because the LMFIC Policies do not afford coverage for the Underlying Jane Doe #1 Lawsuit, LMFIC is not obligated to defend or indemnify Red Roof Inns, Red Roof Franchising, RRI West, RRI III, or FMW RRI NC against the Underlying Jane Doe #1 Lawsuit.

135.     Because the LMFIC Policies do not afford coverage for the Underlying Jane Doe #1 Lawsuit, LMFIC is entitled to the reimbursement of the amounts that it paid in connection with the defense of the lawsuits.

## COUNT II
## Declaratory Relief – Underlying Jane Doe #2 Lawsuit

136.     LMFIC re-alleges and incorporates by reference Paragraphs 1 to 123 as though fully set forth herein.

137.     The 2011 Policy, 2012 Policy, 2013 Policy, and the 2014 Policy (the "2011-2014 Policies") do not afford coverage under Coverage A for the Underlying Jane Doe #2 Lawsuit to the extent Jane Doe #2's alleged "bodily injury" did not occur during the 2011-2014 Policies' policy periods.

138.     There is no duty to defend the Red Roof Entities under the 2011-2014 Policies against the Underlying Jane Doe #2 Lawsuit Complaint because Jane Doe #2 does not allege "bodily injury" caused by an "occurrence".

139.    There is no coverage under Coverage A for the Underlying Jane Doe #2 Lawsuit under the 2011-2014 Policies because Jane Doe #2's alleged "bodily injury" was not caused by an "occurrence".

140.    The Expected and Intended Injury Exclusion bars coverage for Jane Doe #2's alleged "bodily injury" under Coverage A of the 2011-2014 Policies.

141.    In the Underlying Jane Doe #2 Lawsuit Complaint, Jane Doe #2 does not allege an offense resulting in a "personal and advertising injury" under Coverage B of the 2011-2014 Policies.

142.    In the Underlying Jane Doe #2 Lawsuit Complaint, Jane Doe #2 does not allege "personal and advertising injury" arising out of the business of Red Roof Inns, Red Roof Franchising, RRI West, RRI III, or FMW RRI NC under Coverage B of the 2011-2014 Policies.

143.    To the extent Jane Doe #2 alleges "personal and advertising injury" in the Underlying Jane Doe #2 Lawsuit Complaint, the Knowing Violation of Rights of Another Exclusion in the 2011-2014 Policies bars coverage for Jane Doe #2's alleged "personal and advertising injury" under Coverage B of the 2011-2014 Policies.

144.    To the extent Jane Doe #2 alleges "personal and advertising injury" in the Underlying Jane Doe #2 Lawsuit Complaint, the Criminal Acts Exclusion in the

2011-2014 Policies bars coverage for Jane Doe #2's alleged "personal and advertising injury" under Coverage B of the 2011-2014 Policies.

145.    The LMFIC Policies do not afford coverage to Red Roof Inns, Red Roof Franchising, RRI West, RRI III, or FMW RRI NC for the Underlying Jane Doe #2 Lawsuit.

146.    Because the LMFIC Policies do not afford coverage for the Underlying Jane Doe #2 Lawsuit, LMFIC is not obligated to defend or indemnify Red Roof Inns, Red Roof Franchising, RRI West, RRI III, or FMW RRI NC against the Underlying Jane Doe #2 Lawsuit.

147.    Because the LMFIC Policies do not afford coverage for the Underlying Jane Doe #2 Lawsuit, LMFIC is entitled to the reimbursement of the amounts that it paid in connection with the defense of the lawsuits.

### COUNT III
### Declaratory Relief – Underlying Jane Doe #3 Lawsuit

148.    LMFIC re-alleges and incorporates by reference Paragraphs 1 to 123 as though fully set forth herein.

149.    The 2011 Policy and the 2012 Policy (the "2011-2012 Policies") do not afford coverage under Coverage A for the Underlying Jane Doe #3 Lawsuit to the extent Jane Doe #3's alleged "bodily injury" did not occur during the 2011-2012 Policies' policy periods.

150.    There is no duty to defend the Red Roof Entities under the 2011-2012 Policies against the Underlying Jane Doe #3 Lawsuit Complaint because Jane Doe #3 does not allege "bodily injury" caused by an "occurrence".

151.    There is no coverage under Coverage A for the Underlying Jane Doe #3 Lawsuit under the 2011-2012 Policies because Jane Doe #3's alleged "bodily injury" was not caused by an "occurrence".

152.    The Expected and Intended Injury Exclusion bars coverage for Jane Doe #3's alleged "bodily injury" under Coverage A of the 2011-2012 Policies.

153.    In the Underlying Jane Doe #3 Lawsuit Complaint, Jane Doe #3 does not allege an offense resulting in a "personal and advertising injury" under Coverage B of the 2011-2012 Policies.

154.    In the Underlying Jane Doe #3 Lawsuit Complaint, Jane Doe #3 does not allege "personal and advertising injury" arising out of the business of Red Roof Inns, Red Roof Franchising, RRI West, RRI III, or FMW RRI NC under Coverage B of the 2011-2012 Policies.

155.    To the extent Jane Doe #3 alleges "personal and advertising injury" in the Underlying Jane Doe #3 Lawsuit Complaint, the Knowing Violation of Rights of Another Exclusion in the 2011-2012 Policies bars coverage for Jane Doe #3's

alleged "personal and advertising injury" under Coverage B of the 2011-2012 Policies.

156.   To the extent Jane Doe #3 alleges "personal and advertising injury" in the Underlying Jane Doe #3 Lawsuit Complaint, the Criminal Acts Exclusion in the 2011-2012 Policies bars coverage for Jane Doe #3's alleged "personal and advertising injury" under Coverage B of the 2011-2012 Policies.

157.   The LMFIC Policies do not afford coverage to Red Roof Inns, Red Roof Franchising, RRI West, RRI III, or FMW RRI NC for the Underlying Jane Doe #3 Lawsuit.

158.   Because the LMFIC Policies do not afford coverage for the Underlying Jane Doe #3 Lawsuit, LMFIC is not obligated to defend or indemnify Red Roof Inns, Red Roof Franchising, RRI West, RRI III, or FMW RRI NC against the Underlying Jane Doe #3 Lawsuit.

159.   Because the LMFIC Policies do not afford coverage for the Underlying Jane Doe #3 Lawsuit, LMFIC is entitled to the reimbursement of the amounts that it paid in connection with the defense of the lawsuits.

## COUNT IV
## Declaratory Relief – Underlying Jane Doe #4 Lawsuit

160.   LMFIC re-alleges and incorporates by reference Paragraphs 1 to 123 as though fully set forth herein.

161.    The 2011 Policy and the 2012 Policy (the "2011-2012 Policies") do not afford coverage under Coverage A for the Underlying Jane Doe #4 Lawsuit to the extent Jane Doe #4's alleged "bodily injury" did not occur during the 2011-2012 Policies' policy periods.

162.    There is no duty to defend the Red Roof Entities under the 2011-2012 Policies against the Underlying Jane Doe #4 Lawsuit Complaint because Jane Doe #4 does not allege "bodily injury" caused by an "occurrence".

163.    There is no coverage under Coverage A for the Underlying Jane Doe #4 Lawsuit under the 2011-2012 Policies because Jane Doe #4's alleged "bodily injury" was not caused by an "occurrence".

164.    The Expected and Intended Injury Exclusion bars coverage for Jane Doe #4's alleged "bodily injury" under Coverage A of the 2011-2012 Policies.

165.    In the Underlying Jane Doe #4 Lawsuit Complaint, Jane Doe #4 does not allege an offense resulting in a "personal and advertising injury" under Coverage B of the 2011-2012 Policies.

166.    In the Underlying Jane Doe #4 Lawsuit Complaint, Jane Doe #4 does not allege "personal and advertising injury" arising out of the business of Red Roof Inns, Red Roof Franchising, RRI West, RRI III, or FMW RRI NC under Coverage B of the 2011-2012 Policies.

167.    To the extent Jane Doe #4 alleges "personal and advertising injury" in the Underlying Jane Doe #4 Lawsuit Complaint, the Knowing Violation of Rights of Another Exclusion in the 2011-2012 Policies bars coverage for Jane Doe #4's alleged "personal and advertising injury" under Coverage B of the 2011-2012 Policies.

168.    To the extent Jane Doe #4 alleges "personal and advertising injury" in the Underlying Jane Doe #4 Lawsuit Complaint, the Criminal Acts Exclusion in the 2011-2012 Policies bars coverage for Jane Doe #4's alleged "personal and advertising injury" under Coverage B of the 2011-2012 Policies.

169.    The LMFIC Policies do not afford coverage to Red Roof Inns, Red Roof Franchising, RRI West, RRI III, or FMW RRI NC for the Underlying Jane Doe #4 Lawsuit.

170.    Because the LMFIC Policies do not afford coverage for the Underlying Jane Doe #4 Lawsuit, LMFIC is not obligated to defend or indemnify Red Roof Inns, Red Roof Franchising, RRI West, RRI III, or FMW RRI NC against the Underlying Jane Doe #4 Lawsuit.

171.    Because the LMFIC Policies do not afford coverage for the Underlying Jane Doe #4 Lawsuit, LMFIC is entitled to the reimbursement of the amounts that it paid in connection with the defense of the lawsuits.

**COUNT V**
**Declaratory Relief – Underlying W.K. Lawsuit**

172.     LMFIC re-alleges and incorporates by reference Paragraphs 1 to 123 as though fully set forth herein.

173.     There is no coverage under Coverage A for the Underlying W.K. Lawsuit for alleged "bodily injury" that did not occur during the LMFIC Policies' policy periods.

174.     There is no duty to defend the Red Roof Entities against the Underlying W.K. Lawsuit Complaint because the Underlying W.K. Plaintiffs do not allege "bodily injury" caused by an "occurrence".

175.     There is no coverage under Coverage A for the Underlying W.K. Lawsuit under the LMFIC Policies because the Underlying W.K. Plaintiffs' alleged "bodily injury" was not caused by an "occurrence".

176.     The Expected and Intended Injury Exclusion bars coverage for the Underlying W.K. Plaintiffs' alleged "bodily injury" under Coverage A.

177.     In the Underlying W.K. Lawsuit Complaint, the Underlying W.K. Plaintiffs do not allege an offense resulting in a "personal and advertising injury" under Coverage B.

178.     In the Underlying W.K. Lawsuit Complaint, the Underlying W.K. Plaintiffs do not allege "personal and advertising injury" arising out of the business

of Red Roof Inns, Red Roof Franchising, RRI West, RRI III, or FMW RRI NC under Coverage B.

179.    To the extent the Underlying W.K. Plaintiffs allege "personal and advertising injury" in the Underlying W.K. Lawsuit Complaint, the Knowing Violation of Rights of Another Exclusion in the LMFIC Policies bars coverage for the Underlying W.K. Plaintiffs' alleged "personal and advertising injury" under Coverage B.

180.    To the extent the Underlying W.K. Plaintiffs allege "personal and advertising injury" in the Underlying W.K. Lawsuit Complaint, the Criminal Acts Exclusion in the LMFIC Policies bars coverage for the Underlying Plaintiffs' alleged "personal and advertising injury" under Coverage B.

181.    With respect to the 2017 Policy and the 2018 Policy, in the Underlying W.K. Lawsuit Complaint, the Underlying W.K. Plaintiffs have not alleged a "wrongful act" committed by an insured in the course of providing "hospitality services" under the Errors and Omissions Endorsement.

182.    With respect to the 2017 Policy and the 2018 Policy, there is no coverage under the Errors and Omissions Endorsement for the Underlying W.K. Lawsuit to the extent that the Underlying W.K. Plaintiffs do not allege a "wrongful act" that occurred during the LMFIC Policies' policy periods.

183.    With respect to the 2017 Policy and the 2018 Policy, the Criminal Acts/Expected or Intended Exclusion bars coverage for the Underlying W.K. Plaintiffs' allegations in the Underlying W.K. Lawsuit Complaint under the Errors and Omissions Coverage Endorsement.

184.    With respect to the 2017 Policy and the 2018 Policy, the Bodily Injury/Emotional Distress Exclusion bars coverage for the Underlying W.K. Plaintiffs' allegations in the Underlying W.K. Lawsuit Complaint under the Errors and Omissions Coverage Endorsement.

185.    With respect to the 2017 Policy and the 2018 Policy, the Personal and Advertising Injury Exclusion bars coverage for the Underlying W.K. Plaintiffs' allegations in the Underlying W.K. Lawsuit Complaint under the Errors and Omissions Coverage Endorsement.

186.    The LMFIC Policies do not afford coverage to Red Roof Inns, Red Roof Franchising, RRI West, RRI III, or FMW RRI NC for the Underlying W.K. Lawsuit.

187.    Because the LMFIC Policies do not afford coverage for the Underlying W.K. Lawsuit, LMFIC is not obligated to defend or indemnify Red Roof Inns, Red Roof Franchising, RRI West, RRI III, or FMW RRI NC against the Underlying W.K. Lawsuit.

188.     Because the LMFIC Policies do not afford coverage for the Underlying W.K. Lawsuit, LMFIC is entitled to the reimbursement of the amounts that it paid in connection with the defense of the lawsuits.

## COUNT VI
### Declaratory Relief – Underlying H.B. Lawsuit

189.     LMFIC re-alleges and incorporates by reference Paragraphs 1 to 123 as though fully set forth herein.

190.     There is no coverage under Coverage A for the Underlying H.B. Lawsuit for alleged "bodily injury" that did not occur during the 2011 Policy's policy period.

191.     There is no duty to defend the Red Roof Inns under the 2011 Policy against the Underlying H.B. Lawsuit Complaint because H.B. does not allege "bodily injury" caused by an "occurrence".

192.     There is no coverage under Coverage A for the Underlying H.B. Lawsuit under the 2011 Policy because H.B.'s alleged "bodily injury" was not caused by an "occurrence".

193.     The Expected and Intended Injury Exclusion bars coverage for H.B.'s alleged "bodily injury" under Coverage A of the 2011 Policy.

194.    In the Underlying H.B. Lawsuit Complaint, H.B. does not allege an offense resulting in a "personal and advertising injury" under Coverage B of the 2011 Policy.

195.    In the Underlying H.B. Lawsuit Complaint, H.B. does not allege "personal and advertising injury" arising out of the business of Red Roof Inns under Coverage B of the 2011 Policy.

196.    To the extent H.B. alleges "personal and advertising injury" in the Underlying H.B. Lawsuit Complaint, the Knowing Violation of Rights of Another Exclusion in the 2011 Policy bars coverage for H.B.'s alleged "personal and advertising injury" under Coverage B of the 2011 Policy.

197.    To the extent H.B. alleges "personal and advertising injury" in the Underlying H.B. Lawsuit Complaint, the Criminal Acts Exclusion in the 2011 Policy bars coverage for H.B.'s alleged "personal and advertising injury" under Coverage B.

198.    The LMFIC Policies do not afford coverage to Red Roof Inns for the Underlying H.B. Lawsuit.

199.    Because the LMFIC Policies do not afford coverage for the Underlying H.B. Lawsuit, LMFIC is not obligated to defend or indemnify Red Roof Inns against the Underlying H.B. Lawsuit.

200.    Because the LMFIC Policies do not afford coverage for the Underlying H.B. Lawsuit, LMFIC is entitled to the reimbursement of the amounts that it paid in connection with the defense of the lawsuits.

## COUNT VII
### Declaratory Relief – Underlying K.M. Lawsuit

201.    LMFIC re-alleges and incorporates by reference Paragraphs 1 to 123 as though fully set forth herein.

202.    The 2014 Policy and the 2015 Policy (the "2014-2015 Policies") do not afford coverage under Coverage A for the Underlying K.M. Lawsuit to the extent K.M.'s alleged "bodily injury" did not occur during the 2014-2015 Policies' policy periods.

203.    There is no duty to defend Red Roof Inns under the 2014-2015 Policies against the Underlying K.M. Lawsuit Complaint because K.M. does not allege "bodily injury" caused by an "occurrence".

204.    There is no coverage under Coverage A for the Underlying K.M. Lawsuit under the 2014-2015 Policies because K.M.'s alleged "bodily injury" was not caused by an "occurrence".

205.    The Expected and Intended Injury Exclusion bars coverage for K.M.'s alleged "bodily injury" under Coverage A of the 2014-2015 Policies.

206.    In the Underlying K.M. Lawsuit Complaint, K.M. does not allege an offense resulting in a "personal and advertising injury" under Coverage B of the 2014-2015 Policies.

207.    In the Underlying K.M. Lawsuit Complaint, K.M. does not allege "personal and advertising injury" arising out of the business of Red Roof Inns under Coverage B of the 2014-2015 Policies.

208.    To the extent K.M. alleges "personal and advertising injury" in the Underlying K.M. Lawsuit Complaint, the Knowing Violation of Rights of Another Exclusion in the 2014-2015 Policies bars coverage for K.M.'s alleged "personal and advertising injury" under Coverage B of the 2014-2015 Policies.

209.    To the extent K.M. alleges "personal and advertising injury" in the Underlying K.M. Lawsuit Complaint, the Criminal Acts Exclusion in the 2014-2015 Policies bars coverage for K.M.'s alleged "personal and advertising injury" under Coverage B of the 2014-2015 Policies.

210.    The LMFIC Policies do not afford coverage to Red Roof Inns for the Underlying K.M. Lawsuit.

211.    Because the LMFIC Policies do not afford coverage for the Underlying K.M. Lawsuit, LMFIC is not obligated to defend or indemnify Red Roof Inns against the Underlying K.M. Lawsuit.

212.    Because the LMFIC Policies do not afford coverage for the Underlying K.M. Lawsuit, LMFIC is entitled to the reimbursement of the amounts that it paid in connection with the defense of the lawsuits.

## COUNT VIII
## <u>Declaratory Relief – Underlying Lawsuits</u>

213.    LMFIC re-alleges and incorporates by reference Paragraphs 1 to 123 as though fully set forth herein.

214.    The Underlying Plaintiffs' allegations concerning their alleged "bodily injury" at the Red Roof Smyrna constitute one "occurrence" under the LMFIC Policies.

215.    The Underlying Plaintiffs' allegations concerning their alleged "bodily injury" at the Red Roof Atlanta constitute one "occurrence" under the LMFIC Policies.

216.    The Underlying Plaintiffs' allegations concerning their alleged "bodily injury" at the Red Roof Norcross constitute one "occurrence" under the LMFIC Policies.

217.    The Underlying Plaintiffs' allegations concerning their alleged "bodily injury" at the Red Roof Frederick constitute one "occurrence" under the LMFIC Policies.

218.   To the extent that the LMFIC Policies afford coverage for the Underlying Plaintiffs' allegations concerning the Red Roof Smyrna, then, pursuant to the Non-Cumulation of Liability endorsement, there is a single Each Occurrence Limit of liability available, collectively, for the Underlying Plaintiffs' allegations under the LMFIC Policies.

219.   To the extent that the LMFIC Policies afford coverage for the Underlying Plaintiffs' allegations concerning the Red Roof Atlanta, then, pursuant to the Non-Cumulation of Liability endorsement, there is a single Each Occurrence Limit of liability available, collectively, for the Underlying Plaintiffs' allegations under the LMFIC Policies.

220.   To the extent that the LMFIC Policies afford coverage for the Underlying Plaintiffs' allegations concerning the Red Roof Norcross, then, pursuant to the Non-Cumulation of Liability endorsement, there is a single Each Occurrence Limit of liability available, collectively, for the Underlying Plaintiffs' allegations under the LMFIC Policies.

221.   To the extent that the LMFIC Policies afford coverage for the Underlying Plaintiffs' allegations concerning the Red Roof Frederick, then, pursuant to the Non-Cumulation of Liability endorsement, there is a single Each Occurrence

Limit of liability available, collectively, for the Underlying Plaintiffs' allegations under the LMFIC Policies.

## PRAYER FOR RELIEF

WHEREFORE, LMFIC seeks the following relief:

1. With respect to the Primary Policies:

   a. A declaration that, because the LMFIC Policies do not afford coverage for the Underlying Jane Doe #1 Lawsuit, LMFIC is not required to defend or indemnify Red Roof Inns, Red Roof Franchising, RRI West, RRI III, or FMW RRI NC against the Underlying Jane Doe #1 Lawsuit.

   b. A declaration that, because the LMFIC Policies do not afford coverage for the Underlying Jane Doe #2 Lawsuit, LMFIC is not required to defend or indemnify Red Roof Inns, Red Roof Franchising, RRI West, RRI III, or FMW RRI NC against the Underlying Jane Doe #2 Lawsuit.

   c. A declaration that, because the LMFIC Policies do not afford coverage for the Underlying Jane Doe #3 Lawsuit, LMFIC is not required to defend or indemnify Red Roof Inns, Red Roof Franchising, RRI West, RRI III, or FMW RRI NC against the Underlying Jane Doe #3 Lawsuit.

   d. A declaration that, because the LMFIC Policies do not afford coverage for the Underlying Jane Doe #4 Lawsuit, LMFIC is not required to defend or indemnify Red Roof Inns, Red Roof Franchising, RRI West, RRI III, or FMW RRI NC against the Underlying Jane Doe #4 Lawsuit.

   e. A declaration that, because the LMFIC Policies do not afford coverage for the Underlying W.K. Lawsuit, LMFIC is not required to defend or indemnify Red Roof Inns, Red Roof Franchising, RRI West, RRI III, or FMW RRI NC against the Underlying W.K. Lawsuit.

h. A declaration that, because the LMFIC Policies do not afford coverage for the Underlying H.B. Lawsuit, LMFIC is not required to defend or indemnify Red Roof Inns against the Underlying H.B. Lawsuit.

i. A declaration that, because the LMFIC Policies do not afford coverage for the Underlying K.M. Lawsuit, LMFIC is not required to defend or indemnify Red Roof Inns against the Underlying K.M. Lawsuit.

j. To the extent that the LMFIC Policies afford coverage for the Underlying Plaintiffs' concerning the Red Roof Smyrna, then, pursuant to the Non-Cumulation of Liability endorsement, there is a single Each Occurrence Limit of liability available, collectively, for the Underlying Plaintiffs' allegations under the LMFIC Policies.

k. To the extent that the LMFIC Policies afford coverage for the Underlying Plaintiffs' concerning the Red Roof Atlanta, then, pursuant to the Non-Cumulation of Liability endorsement, there is a single Each Occurrence Limit of liability available, collectively, for the Underlying Plaintiffs' allegations under the LMFIC Policies.

l. To the extent that the LMFIC Policies afford coverage for the Underlying Plaintiffs' concerning the Red Roof Norcross, then, pursuant to the Non-Cumulation of Liability endorsement, there is a single Each Occurrence Limit of liability available, collectively, for the Underlying Plaintiffs' allegations under the LMFIC Policies.

m. To the extent that the LMFIC Policies afford coverage for the Underlying Plaintiffs' concerning the Red Roof Frederick, then, pursuant to the Non-Cumulation of Liability endorsement, there is a single Each Occurrence Limit of liability available, collectively, for the Underlying Plaintiffs' allegations under the LMFIC Policies.

2. For any other or further relief that the Court deems just, proper, and

equitable.

**Respectfully submitted, this 30th day of January 2023**

_/s/_ _Erika C. Birg_____
Erika C. Birg
Georgia Bar No. 058140
Erika.Birg@nelsonmullins.com
Nelson Mullins Riley & Scarborough
LLP
201 17th Street NW
Suite 1700
Atlanta, GA 30363
Tel: (404) 332-6110

*Of Counsel:*

Nancy D. Adams *(pro hac vice)*
NDAdams@mintz.com
Alec J. Zadek *(pro hac vice)*
AZadek@mintz.com
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
Tel: (617) 542-6000

Alexandra Gallo-Cook *(pro hac vice)*
lgallocook@mintz.com
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
919 Third Avenue
New York, NY 10022
Tel: (212) 935-3000

*Counsel for Plaintiff Liberty Mutual
Fire Insurance Company*